## Attachment A

### Affidavit in Support of Criminal Complaint

I, William K. Bryan, the undersigned complainant, after being duly sworn, state the following is true to the best of my belief and knowledge:

1. I am a Special Agent within the Federal Bureau of Investigation (FBI). I have been so employed for over twenty years, and am currently assigned to the FBI office in Birmingham, Alabama.

2. This affidavit is made in support of a criminal complaint against **Joran van der Sloot** (hereafter, **"van der Sloot"**), a citizen of the Netherlands, who resides from time-to-time on the island of Aruba, and is based on information provided to me by other law enforcement officials, including, but not limited to, FBI special agents, Aruban Police officers, witness interviews conducted by law enforcement officers, and affiant's personal knowledge of international electronic communications that have recently occurred between van der Sloot and a representative of Beth Holloway Twitty (hereafter, "Mrs. Twitty"). The representative of Mrs. Twitty is a cooperating witness in this case. Based on the information contained herein, affiant respectfully submits there is probable cause to believe that van der Sloot has committed the federal offense of extortion, in

violation of Title 18, United States Code, Section 1951(a) and the federal offense of wire fraud, in violation of Title 18, United States Code, Section 1344.

## Background

3. On May 30, 2005, Natalee Holloway (hereafter, "Natalee") failed to return to Birmingham from a high school graduation trip to Aruba. Natalee was scheduled to fly home on May 30, 2005, but failed to appear for her flight. She was last seen by her classmates leaving Carlos'n Charlie's, a Caribbean chain restaurant and nightclub in Oranjestad, Aruba, sitting inside a vehicle with van der Sloot and two acquaintances - brothers Deepak and Satish Kalpoe.

4. When Natalee failed to return home, her mother, Mrs. Twitty, along with her step-father, George "Jug" Twitty, and other friends immediately traveled to Aruba in an effort to ascertain Natalee's whereabouts. Within hours of landing in Aruba, the Twittys provided Aruban police with van der Sloot's name and address, identifying him as the person with whom Natalee had left the nightclub on the previous evening. On June 2, 2005, van der Sloot told authorities that he and Holloway had driven to the California Lighthouse area of Arashi Beach because Holloway wanted to see sharks. He said that he dropped Holloway off at her hotel, the Holiday Inn around 2:00 a.m. VAN DER SLOOT has since made several contradictory statements about what happened to Holloway and his

involvement.

5. In the years following Natalee's disappearance, extensive searches have been conducted on the island of Aruba and in the surrounding waters, with no success. Over time, monetary rewards of up to $1 million have been offered for Natalee's safe return. In addition, rewards of up to $250,000 have been offered for information leading to the return of her remains.

## Scheme

6. On or about March 29, 2010, van der Sloot contacted the cooperating witness via email, using the email address, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ During a series of emails that followed, van der Sloot offered to take the cooperating witness to the location of Natalee Holloway's body, advise the cooperating witness as to the circumstances of her death, and identify those involved in her death and disappearance in return for a payment of $250,000. Van der Sloot indicated to the cooperating witness that unless Mrs. Twitty paid the money demanded he would not tell where the remains of her daughter were hidden, nor provide any information regarding the circumstances of her death. During a subsequent series of emails, van der Sloot agreed to modify the terms of his offer. For an initial payment of $25,000, he would take the cooperating witness to the location of Natalee's body. Upon recovery of the body and confirmation that it

3

was, in fact, the remains of Natalee Holloway, van der Sloot would be paid an additional $225,000 by Mrs. Twitty. Van der Sloot later emailed his bank account information to the cooperating witness, so that the money could be deposited into his bank account by wire transfer. The information sent by van der Sloot revealed that his account is located at the SNS Bank, located in the Netherlands. While negotiating this deal via email, van der Sloot insisted that a written contract between him and Mrs. Twitty be prepared by the cooperating witness. The contract was to set out the terms of their agreement and be signed by both parties. The cooperating witness drew up the agreement and sent it by electronic facsimile (FAX) from his office in New York to Mrs. Twitty in Birmingham, Alabama. Mrs. Twitty signed the agreement and FAXed it back to the cooperating witness.

7. On April 15, 2010, Mrs. Twitty executed a wire transfer of $100 from Regions Bank in Birmingham, Alabama to van der Sloot's bank account in the Netherlands, to confirm that the account was, in fact, a good account. Bank records later confirmed the wire transfer of the funds into van der Sloot's account.

8. On May 10, 2010, the cooperating witness flew to Aruba to meet with van der Sloot. Before the cooperating witness departed the United States, Mrs. Twitty wire transferred the sum of $10,000 from her bank account in Birmingham, Alabama, to the cooperating witness's bank account in New York, so that he could

4

withdraw this amount in cash and carry it with him to his meeting with van der Sloot. Once in Aruba, the cooperating witness called van der Sloot, who said he would come to the hotel where the cooperating witness was staying. After van der Sloot arrived, the cooperating witness presented him with the agreement signed by Mrs. Twitty. Van der Sloot and the cooperating witness signed two copies of the agreement and took pictures of each other signing the agreement. The cooperating witness then gave $10,000 in cash to van der Sloot. This meeting was recorded. Next, the cooperating witness called Mrs. Twitty, who immediately wire transferred $15,000, the balance of the initial payment, from her bank account in Regions Bank in Birmingham, Alabama, to van der Sloot's bank account in the Netherlands. Van der Sloot confirmed to the cooperating witness that the wire transfer had occurred. Van der Sloot also confirmed to the cooperating witness that he used the ▮▮▮▮▮▮▮▮▮▮ account

9. The cooperating witness and van der Sloot got into the cooperating witness's rental car and left the hotel. They drove to a house located at ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Once there, van der Sloot pointed to the residence and said that Natalee Holloway's body would be found in the foundation of the house. The cooperating witness wanted to be certain which house van der Sloot was identifying so he took photographs of the house. Van der Sloot then told the

5

cooperating witness that van der Sloot's father, Paulus van der Sloot, had disposed of Natalee's body by burying her remains in the gravel under the foundation of the single story house. Van der Sloot went on to admit that he had been with Natalee on the night of May 29/30, 2005, and that he had thrown her to the ground after she had attempted to stop him from leaving her. Van der Sloot claimed that when she fell down, she hit her head on a rock and died as a result of the impact. Van der Sloot told the cooperating witness that he hid Natalee's body and then returned home and told his father what had happened. According to van der Sloot, his father accompanied him to the location where van der Sloot had secreted Natalee's body. Van der Sloot returned to the car while his father further concealed the body. Van der Sloot said that a few days later, his father buried Natalee's body under the house van der Sloot had shown the cooperating witness. Van der Sloot added that he had not actually seen his father inter the remains, but was told and shown by his father where the body was buried.

10. A review by Aruban law enforcement officials of a building permit for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the residence indicated by van der Sloot, revealed that there was no foundation or structure on that parcel of land at the time of Natalee Holloway's disappearance. The document indicates that a permit was requested on 5/23/2005, that a permit was approved on 5/26/2005, that a site

6

inspection was conducted on 6/15/2005, and that the permit was not issued until 10/18/2010. An interview with the contractor who built the house confirms that the house identified by van der Sloot was not under construction at the time of Natalee Holloway's disappearance. Further, investigation discovered aerial photographs which were taken on May 29, 2005 and June 5, 2005, that show no construction was underway at the location.

11. After leaving Aruba the cooperating witness exchanged additional emails with van der Sloot. In a May 17, 2010 email, van der Sloot admitted to the cooperating witness that he had lied about the location of Natalee Holloway's remains.

Based on the foregoing I have probable cause to believe that JORAN VAN DER SLOOT has committed extortion in violation of Title 18, United States Code, Section 1951(a) and wire fraud in violation of Title 18, United States Code, Section 1344.

William K. Bryan
Affiant

Paul W. Greene
U.S. Magistrate Judge